UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IVAN SAGDAI, | CASE NO. 2:21-cv-00182-LK |
| Plaintiff, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |
| TRAVELERS HOME AND MARINE INSURANCE COMPANY, | |
| Defendant. | |

This matter comes before the Court on Travelers Home and Marine Insurance Company's motion for summary judgment. Dkt. No. 41. For the reasons set forth below, the Court grants the motion in part and denies it in part.[1] Specifically, the Court grants the motion as to Sagdai's claim for bad faith based on Travelers' litigation conduct and request for access to the PIP file. Otherwise, the motion is denied.

---

[1] Because this matter can be decided based on the parties' filings, the Court denies Travelers' request for oral argument. In Sagdai's Notice of Intent and Request to File Surreply, he requested oral argument regarding "the material contained" in any of his "material and arguments" that the Court strikes as inadmissible. Dkt. No. 58 at 1. The Court denies that request because Sagdai is not entitled to orally present evidence that has been excluded as improperly filed.

# I.    BACKGROUND

This insurance dispute arises out of an automobile collision in October 2013 in Renton, Washington. Dkt. No. 2-3 at 3. Ivan Sagdai was stopped in traffic when another driver rear-ended his vehicle and caused it to "smash[]" into the car in front of him. *Id.* Sagdai settled his claims with the at-fault driver for $25,000, the limits of that driver's insurance. Dkt. No. 2-2 at 2. Sagdai then sought to recover under his Underinsured Motorists ("UIM") insurance policy with Travelers. Dkt. No. 1-2 at 12; Dkt. No. 18-2 (the "Policy"). In this lawsuit, Sagdai alleges that Travelers underpaid and mishandled the UIM claim. Travelers counters that it properly handled the claim and paid the amount owed. It also contends that Sagdai failed to cooperate in the investigation.

## A.    The Insurance Policy

Relevant here are two Policy provisions. First, Travelers:

> will pay damages which an "insured" is legally entitled to recover from the owner or operator of an "underinsured motor vehicle" because of "bodily injury":
>
> 1. Sustained by an "insured"; and
>
> 2. Caused by an accident.

Dkt. No. 18-2 at 23. Second, a "person seeking coverage" must:

> 1. Cooperate with [Travelers] in the investigation, settlement or defense of any claim or suit.
>
> . . .
>
> 3. Submit, as often as [Travelers] reasonably require[s]:
>    a. to physical exams by physicians [Travelers] select[s].
>
> 4. Authorize [Travelers] to obtain:
>    a. medical reports; and
>    b. other pertinent records.

*Id.* at 28.

1      **B.      Sagdai's Insurance Claim**

2             On March 19, 2019, Sagdai sent a demand letter to Travelers alleging that the crash caused

3      physical injuries including "neck injury, mid back to low back injuries on both sides, back

4      abdominal wall on both sides, shoulder blade region, along with pain in both arms and pain in the

5      left upper leg and right lower leg." Dkt. No. 2-3 at 8. He also alleged a traumatic brain injury that

6      left him "unable to function at the level he did before the crash." *Id.* The letter alleged that after

7      the accident, Sagdai became unable to multi-task at work, got lost driving on occasion, became

8      short-tempered with his employees, and experienced a change in his personality. *Id.* at 5. He also

9      claimed difficulty concentrating and increased anxiety. *Id.* at 8. He alleged that in November 2013,

10     a neurologist, Dr. Gregory Gorman, diagnosed him with a traumatic brain injury and noted

11     cognitive slowing, headache, retrieval-type memory deficit, and diminished sense of smell. *Id.* He

12     also alleged that an "MRI with tensor diffusion imaging showed interruption of the deep white

13     matter tracts in [his] brain." *Id.*

14            The demand letter further alleged that while "[m]ost of the physical injuries had healed,"

15     Sagdai's brain injury had not and was permanent. *Id.* The letter stated that he had economic

16     damages totaling $26,931.14 for medical expenses and associated mileage expenses, and general

17     damages in an unspecified amount. *Id.* at 8–9. The letter went on to state that his claim "should be

18     valued [at] no less than $500,000[,]" but that he was "willing to settle the UIM part of his claim

19     for his policy limits of $250,000.00." *Id.* at 9.

20            After receiving the demand letter, Travelers opened a claim and commenced an

21     investigation. Dkt. No. 44 at 1–2. Based on the information Sagdai provided, Travelers issued

22     payment of $12,922.84 for personal injury protection ("PIP") benefits under the PIP policy. Dkt.

23     No. 41 at 3. Sagdai does not challenge the payment or the handling of his PIP claim in this

24     litigation.

Travelers also evaluated Sagdai's UIM claim, reviewing the available records, speaking with Sagdai's counsel, and tasking a nurse to "determine the causal relationship of the claimed injuries to the MVA [motor vehicle accident]." Dkt. No. 52-1 at 238–240. After Travelers received additional medical records, it asked the nurse to conduct a supplemental records review "for causal relationship of treatment to the injury" and "for relatedness of the concussion to ongoing complaints of a TBI [traumatic brain injury]." *Id.* at 242. After completing her supplemental review, the nurse noted that the accident "appears to support soft tissue injuries to the spinal regions." *Id.* She also noted that Sagdai "may have . . . sustained a closed head injury" but his baseline status before the accident was unknown. *Id.* She wrote that the record contained results from an MRI with diffusion tensor imaging that reflected "white mat[t]er changes" of unknown origin. *Id.* at 243. She noted that Sagdai had been "diagnosed with a closed head injury (contusion type injury) . . . [but] there is no evidence of 'ongoing' symptoms or a concussion diagnosis (wider ranging injury to the brain)." *Id.* According to Travelers' claims adjustor, "Travelers' evaluation of Plaintiff's medical records and bills" led Travelers to conclude "that the amount owed on the UIM claim was $10,000," and it communicated this offer to Sagdai. Dkt. No. 44 at 2. Travelers' offer, dated April 26, 2019, explained that:

> Mr. Sagdai received mainly chiropractic and massage treatment for his soft tissue injuries that had multiple gaps in treatment sometimes as much as 6 months. Mr. Sagdai continued working as a general contractor after his accident and did not miss any time. Mr. Sagdai was diagnosed with contusion type head injury and referred to a neuro, Dr. Gorman. Dr. Gorman did not refer him for a neuro-psychological testing or any other assessment or prescribe any medications.

Dkt. No. 44-1 at 2. Sagdai rejected the offer. Dkt. No. 44 at 2.

By letter dated August 9, 2019, Sagdai disputed that he experienced only a contusion type head injury, noting that Dr. Gorman diagnosed him with a "shake type closed head injury" and the MRI showed findings consistent with such an injury. Dkt. No. 44-2 at 2. Sagdai requested

information about Travelers' decision, including the identity and qualifications of the reviewer, an "itemized breakdown of all medical diagnoses and treatment that Travelers has determined is related to the collision," "all medical charges that Travelers determined were reasonable for the geographic area," and a copy of "the medical review" of the claim. *Id.* at 2. After receiving that letter, Travelers asked for permission to review the medical records in Sagdai's PIP file, including a report from an independent medical examination ("IME") he had undergone and for Sagdai to participate in another IME. Dkt. Nos. 44 at 2, 19-1 at 2 (August 22, 2019 letter). Travelers did not review the records from the PIP claim to evaluate the UIM claim because "it is Travelers['] practice" to have separate adjusters assigned to each claim and "[w]ithout the insured's permission, the information between the two claims files is typically not shared." Dkt. No. 44 at 2. Sagdai did not respond to the August 2019 request for an IME. *Id.*

Travelers made multiple additional requests for Sagdai to participate in an IME. *See* Dkt. No. 18-1 at 4 (September 20, 2019 letter); *id.* at 6 (October 18, 2019 letter); *id.* at 8 (November 27, 2019 letter); *id.* at 10 (December 17, 2019 letter); *id.* at 16 (January 23, 2020 letter); *id.* at 18 (February 5, 2020 letter); *id.* at 21 (March 6, 2020 letter); *id.* at 24 (April 2, 2020 letter). In the same letters, Travelers also requested permission to review the documents in the PIP file. *See id.*

Sagdai did not agree to participate in an IME or allow Travelers' UIM claims examiner to access the PIP file. Dkt. No. 44 at 2–4. By letter dated December 13, 2019, his counsel noted that Travelers had not answered his questions from his August 9, 2019 letter. Dkt. No. 44-3 at 2. He wrote that "[b]ecause of Traveler[s]' handling of this claim, my client has directed me to file suit on this dispute." *Id.* Despite Sagdai's earlier rejection of its $10,000 offer, on January 24, 2020 Travelers tendered a $10,000 check to Sagdai, without prejudice to his right to seek additional benefits, and Sagdai cashed the check. Dkt. No. 44 at 3.

By letter dated February 21, 2020, Sagdai disputed Travelers' assertion that it needed the

1    PIP information and IME to continue evaluating the claim because "Travelers had already

2    completed its investigation and made an offer in compromise." Dkt. No. 44-5 at 2. Sagdai also

3    stated that Travelers first had to demonstrate that an IME was a reasonable request rather than an

4    after-the-fact "coverup" for its allegedly deficient investigation. *Id.* at 3. Sagdai further noted that

5    Travelers had not responded to his earlier requests for the name, credentials, and report of the

6    expert who evaluated his claim, and to review the information on which Travelers relied to make

7    its offer of $10,000. *Id.*

8    **C.    Sagdai Files Suit**

9           On February 1, 2021, Sagdai filed suit in King County Superior Court, alleging claims for

10   breach of contract, breach of the duty of good faith, and violation of Washington's Consumer

11   Protection Act ("CPA"). Dkt. No. 1-2 at 16–18. Travelers removed the matter to this Court on

12   February 12, 2021. Dkt. No. 1.

13          In November 2021, after Sagdai refused to participate in an IME as Travelers requested

14   under Federal Rule of Civil Procedure 35, Travelers filed a motion to compel Sagdai to (1) appear

15   for a Rule 35 examination; (2) respond to written discovery regarding his physical and mental

16   conditions, injuries and treatment, and damages; and (3) appear and be deposed regarding those

17   topics. Dkt. No. 17 at 2–3. The Court granted the motion, finding that Sagdai had placed his

18   physical condition in controversy by claiming that his brain injury is permanent and requires

19   ongoing medical care. Dkt. No. 28 at 4, 6. Accordingly, it ordered Sagdai to participate in an IME,

20   respond to Travelers' written discovery requests, and be deposed. *Id.* at 6. Dr. James Blue

21   subsequently conducted an IME. Dkt. No. 43-1.

22                              **II.    DISCUSSION**

23   **A.    Jurisdiction**

24          Travelers' notice of removal in this case alleges that this Court has diversity jurisdiction

1    under 28 U.S.C. § 1332(a). Dkt. No. 1 at 3. The parties are diverse: Travelers has its primary place

2    of business in, and is organized under the laws of, Connecticut, and Sagdai is a resident of

3    Washington. Dkt. No. 1-2 at 2.

4        To determine whether the jurisdictional amount has been established, courts may consider

5    "facts presented in the removal petition as well as any summary-judgment-type evidence relevant

6    to the amount in controversy at the time of removal." *Matheson v. Progressive Specialty Ins. Co.*,

7    319 F.3d 1089, 1090 (9th Cir. 2003) (per curiam) (cleaned up). A defendant who removes a case

8    "may point to many different types of evidence" to establish the amount in controversy, and "[a]

9    particularly powerful form of evidence is the plaintiff's own statements about the damages they

10   seek." *Flores v. Safeway, Inc.*, No. C19-0825-JCC, 2019 WL 4849488, at *3 (W.D. Wash. Oct. 1,

11   2019). Such statements can include settlement demands. *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840

12   (9th Cir. 2002) (per curiam); *see also Segar v. Allstate Fire & Cas. Ins. Co.*, No. C21-1526-JLR,

13   2022 WL 102035, at *3 (W.D. Wash. Jan. 11, 2022) ("The court treats [plaintiff's] pre-litigation

14   demand as relevant evidence of the damages that he seeks—namely, the full $100,000 UIM policy

15   limit.").

16       Although the complaint does not allege a specific amount of damages, Sagdai's pre-suit

17   demand letter does. The letter stated that his injuries "should be valued [at] no less than $500,000"

18   and he was "willing to settle the UIM part of his claim for his policy limits of $250,000.00." Dkt.

19   No. 2-3 at 9. That demand "appears to reflect a reasonable estimate of the plaintiff's claim," *Cohn*,

20   281 F.3d at 840, based on Sagdai's claimed injuries. Dkt. No. 2-3 at 9 (alleging a "severe brain

21   injury" that will affect him "for the foreseeable future"). Therefore, it is evident that more than

22   $75,000 is in controversy based on Sagdai's demand and estimate of damages.

23       Because the parties are diverse and the amount in controversy requirement is met, this

24   Court has jurisdiction over the claims under 28 U.S.C. § 1332(a). In addition, Travelers timely

1    removed this matter on February 12, 2021, within 30 days of when it was notified of Sagdai's

2    lawsuit on February 5, 2021. Dkt. No. 1 at 4; *see* 28 U.S.C. § 1446(b)(1).

3    **B.      Summary Judgment Standard**

4            Summary judgment is appropriate only when "the movant shows that there is no genuine

5    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6    Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

7    stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

8    evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

9    sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court

10   resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where

11   the facts specifically averred by that party contradict facts specifically averred by the movant, the

12   motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

13           The Court will, however, enter summary judgment "against a party who fails to make a

14   showing sufficient to establish the existence of an element essential to that party's case, and on

15   which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

16   (1986). Once the moving party has carried its burden under Rule 56(c), "the nonmoving party must

17   come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.

18   Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e))

19   (emphasis omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific

20   allegations, *Lujan*, 497 U.S. at 888–89.

21   **C.      The Scope of the Record**

22           Travelers requests that the Court strike as inadmissible the declaration of Ryan Nute, Dkt.

23   No. 53, portions of the declaration of Rob Dietz, Dkt. No. 54, and "references to the assorted

24   doctors referenced in Plaintiff's Response," Dkt. No. 55 at 1–3. When reviewing a motion for

summary judgment, the Court may "consider admissible evidence" *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 998 (9th Cir. 2019), as well as evidence that "can 'be presented in a *form* that would be admissible' at trial," *Harlow v. Chaffey Cmty. Coll. Dist.*, 2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022) (quoting Fed. R. Civ. P. 56(c)(2)) (emphasis in original). Therefore, the Court first addresses the evidentiary issues Travelers raises as well as the admissibility of Sagdai's surreply and related filings, Dkt. Nos. 59, 60, 60-1, to determine the appropriate scope of the record for this motion.

### 1.   The Declarations of Gavin Flynn, Ryan Nute, and Robert Dietz

Travelers moves to strike the declaration of attorney Ryan Nute, Dkt. No. 53, because it attempts "to introduce a hearsay expert opinion from an unnamed expert in a different case through the testimony of an attorney in that unrelated case." Dkt. No. 55 at 1. It also moves to strike the declaration of Robert Dietz, who claims to be an "expert in claims handling and insurance bad faith," Dkt. No. 54 at 1, because he opines about medical issues without the qualifications to do so, improperly asserts legal conclusions, and provides some opinions that are speculative and without foundation. Dkt. No. 55 at 1–3. But those declarations, and the declaration of Sagdai's counsel Gavin Flynn, Dkt. No. 52, suffer from a more fundamental problem: none of them is certified as true under penalty of perjury as required by 28 U.S.C. § 1746.

To be admissible, the statute requires that the declaration be made "substantially" in the following language: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746(2); *see also Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999). The purpose of this affirmation is to be certain that "the declarant understands the legal significance of the declarant's statements and the potential for punishment if the declarant lies." *United States v. Bueno-Vargas*, 383 F.3d 1104, 1111 (9th Cir. 2004).

1   None of the three declarations substantially complies with 28 U.S.C. § 1746 because none

2   includes a certification under penalty of perjury. Nor do any of them contain a statement that the

3   contents of the declaration are true. Therefore, the Court excludes and does not consider the

4   declarations of Ryan Nute, Robert Dietz, and Gavin Flynn, Dkt. Nos. 52–54, including the portions

5   of Sagdai's response, Dkt. No. 51, that rely upon them.

6           2.      Exhibits to Declarations

7           The Court must also consider the admissibility of the exhibits attached to the excluded

8   declarations. Although Travelers moved to strike the contents of the declarations based on hearsay

9   and other reasons as set forth above, it did not move to strike the exhibits or argue that they are

10  inadmissible. Dkt. No. 55 at 1–3.

11          The declaration of Gavin Flynn attaches "a true and correct copy of selected materials from

12  Defendant[']s Claim File for Ivan Sagdai" and "a true and correct copy of selected pages from the

13  Deposition of Robert Dietz[.]" Dkt. No. 52 at 1. The declaration of Ryan Nute attaches a "true and

14  correct copy of Dr. Blue's response addendum" from another case. Dkt. No. 53 at 2. Mr. Dietz

15  attaches two documents to his declaration without attempting to authenticate either of them. Dkt.

16  No. 54-1 (February 24, 2022 letter with attached report from Dr. Blue); Dkt. No. 54-2 (the Policy).

17  However, these two documents are properly authenticated elsewhere in the record, Dkt. Nos. 43-

18  1, 18-2, so the Court disregards the copies attached to Dietz's declaration as duplicative.[2]

19          Without accompanying admissible declarations, the documents attached to them are not

20  properly authenticated. However, "[c]ourts must now consider unauthenticated evidence at

21  summary judgment if the evidence can 'be presented in a *form* that would be admissible' at trial."

22  *Harlow*, 2022 WL 4077103, at *1 (emphasis in original) (quoting Fed. R. Civ. P. 56(c)(2)).

23

24  ---
[2] Parties may cite to documents already in the record rather than filing additional copies. *See* LCR 10(e)(6).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT - 10

Although the documents are not properly authenticated now, they could be authenticated and presented in admissible form at trial. Therefore, the exhibits to the declarations of Mr. Flynn and Mr. Nute, Dkt. Nos. 52-1, 52-2, 53-1, are admissible for purposes of this motion, *see Harlow*, 2022 WL 4077103, at *1, and the Court considers them.

### 3. Plaintiff's References to Doctors' Opinions

Travelers also "moves to strike references to the assorted doctors referenced in Plaintiff's Response." Dkt. No. 55 at 3 (citing Dkt. No. 51 at 8–10). Travelers avers that "[t]he statements attributable to Dr. Gorman, Dr. Kelly, Dr. Grinberg, and Dr. Zrazhevskaya are unsupported by any sworn declarations from these doctors" and therefore lack proper foundation and are hearsay. *Id.* Travelers notes that none of those doctors has submitted an expert report as required by Federal Rule of Civil Procedure 26. *Id.*

The doctors' statements referenced in Sagdai's response appear in the medical records in Travelers' claim file. Dkt. No. 52-1. Dr. Yakov Grinberg saw Sagdai in October 2013 and noted that Sagdai "reports neck pain, foggy sensation in the head, fatigue, sleepiness, upper back pain. Symptoms started right after [the motor vehicle accident], but neck pain actually got worse in a few days. Patient reports no headache, blurred vision, weakness or numbness of extremities." Dkt. No. 52-1 at 181. A November 2013 medical record from Dr. Gorman notes his "prior assessment" was "[s]hake type closed head injury on 10/20/2013 with some cognitive slowing, headache, retrieval type memory deficit and diminished smell sensation." *Id.* at 226. Dr. Gorman also wrote, "MRI brain at Evergreen with tensor diffusion imaging shows some interruption of deep white matter tracts." *Id.* The file also contains treatment notes from Dr. Yetena Zrazhavskaya, a Naturopathic Physician. *Id.* at 204. Her notes from a February 2014 visit list the symptoms Sagdai reported to her after the accident, including "diminished memory" and "nausea, headache, shooting pain to his head, thoracic and low back pain, brain fog, loss of concentration." *Id.* She stated that

1    "[a]ll those symptoms started after [the motor vehicle accident] and they make it so difficult to run

2    [his] construction business and be productive." *Id.* She also noted that Sagdai reported dizziness

3    and partial loss of the sense of smell. *Id.* at 205. By May 14, 2014, she noted "significant

4    improvement" with his brain fog and memory loss, to the point that Sagdai was able to manage

5    his business. *Id.* at 207. Dr. Kelly saw Sagdai in November 2016 and noted that Sagdai had suffered

6    a "concussion with no loss of consciousness" from the accident. *Id.* at 61.

7         Those out-of-court statements are offered for the truth of the matter asserted, Dkt. No. 51

8    at 8–9, and they appear to be hearsay. Fed. R. Evid. 801. But again, the Court must consider

9    evidence presented for purposes of this motion if it can be can "be presented in a *form* that would

10   be admissible' at trial." *Harlow*, 2022 WL 4077103, at *1 (emphasis in original) (quoting Fed. R.

11   Civ. P. 56(c)(2)). The doctors' statements are therefore admissible here because they could be

12   presented in an admissible form at trial. *See id.*; *accord Fonseca v. Sysco Food Servs. of Ariz., Inc.*,

13   374 F.3d 840, 846 (9th Cir. 2004) (concluding that "even the declarations that do contain hearsay

14   are admissible for summary judgment purposes because they could be presented in an admissible

15   form at trial." (cleaned up)); *see also Denton v. Pastor*, No. 17-cv-5075, 2021 WL 6622137, at *3

16   (W.D. Wash. Dec. 16, 2021) (declining to strike a physician's diagnoses from a declaration

17   because "one of plaintiff's doctors could testify to plaintiff's symptoms and diagnosis at trial"),

18   *report and recommendation adopted*, 2022 WL 203489 (W.D. Wash Jan. 24, 2022); *Sadler v. State

19   Farm Mut. Auto. Ins. Co.*, No. 07-cv-995Z, 2008 WL 4371661, at *6 (W.D. Wash. Sept. 22, 2008)

20   (declining to strike a form signed by a doctor for purposes of evaluating a summary judgment

21   motion).

22        Travelers also contends that the doctors' opinions should be stricken because they did not

23   provide expert reports, but treating physicians are not required to submit written reports under

24   Federal Rule of Civil Procedure 26(a)(2)(B) as long as their opinions "were formed during the

course of treatment." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011). "To the extent that the expert intends 'to render expert testimony beyond the scope of the treatment rendered,' however, the expert must provide a written expert report." *Penny v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-5195-JLR, 2020 WL 5743037 (W.D. Wash. Sept. 25, 2020) (quoting *Goodman*, 644 F.3d at 826). Here, the doctors' statements contained in Travelers' claims file and set forth above appear to have been formed during the course of treatment, so the Court denies Travelers' request to strike them.

4.   Plaintiff's Surreply

After the briefing was completed for this motion, Sagdai filed a surreply. Dkt. No. 59.  A party may file a surreply that "requests to strike material contained in or attached to a reply brief[.]" LCR 7(g). A surreply "shall be strictly limited to addressing the request to strike. Extraneous argument or a surreply filed for any other reason will not be considered." LCR 7(g)(2). Sagdai's surreply is not limited to "requests to strike material" in Travelers' reply brief and instead substantively responds to Travelers' arguments that portions of Sagdai's submissions should be stricken. *See generally* Dkt. No. 59; *see also* Dkt. No. 58 (providing notice of Sagdai's "intent to file his Surreply seeking not to strike certain portions of his Response"). Because Local Civil Rule 7(g) does not allow a surreply under those circumstances, the Court does not consider the surreply or the documents filed with it. Dkt. Nos. 59, 60, 60-1.

**D.   Breach of Contract**

Under Washington law, "[a] breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest. Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995). Sagdai alleges that Travelers breached its contractual duties under the Policy by failing to complete a reasonable investigation before making a compromise offer, making a compromise offer based on speculation

1    and inaccurate information, and failing to provide a reasonable explanation for its compromise

2    offer. Dkt. No. 1-2 at 12–17. Travelers does not dispute that those allegations, if true, could

3    constitute a breach of the Policy,[3] but counters that Sagdai's failure to cooperate relieves it of

4    liability for any breach. Dkt. No. 41 at 16–20.

5           1.    Failure to Cooperate: Policy Language and Legal Standard

6           Travelers contends that Sagdai's breach of contract claim is barred because he refused to

7    cooperate during its investigation. *Id*. The Policy required Sagdai to "[c]ooperate" with Travelers

8    "in the investigation" of his claim, including "[s]ubmit[ting], as often as [Travelers] reasonably

9    require[s] . . . to physical exams" and "[a]uthorizing [Travelers] to obtain" medical records. Dkt.

10   No. 18-2 at 28. The Policy further provides that "[n]o legal action may be brought against

11   [Travelers] until there has been full compliance with all the terms of this policy." *Id*.

12          In Washington, "[w]hen an insured breaches an insurance policy's cooperation clause, the

13   insurer will be relieved of its duty to provide coverage if it can prove that the insured's acts or

14   omissions caused actual and substantial prejudice." *Schwindt v. Commonwealth Ins. Co.*, 997 P.2d

15   353, 358 (Wash. 2000); *see also Staples v. Allstate Ins. Co.*, 295 P.3d 201, 206–209 (Wash. 2013)

16   (establishing that under Washington law, an insured that breaches a cooperation clause may be

17   contractually barred from bringing suit under the policy). To prevail on the affirmative defense of

18   noncooperation, an insurer must show three things: (1) the information at issue was material to the

19   investigation or handling of the insured's claim; (2) the insured failed to "substantially comply"

20   with the terms of the cooperation clause; and (3) the insurer suffered actual prejudice as a result.

21   *Staples*, 295 P.3d at 207, 209.

22

23   [3] "Failure to adequately investigate, if proven, would constitute a breach of contract." *Wall v. Country Mut. Ins. Co.*, 319 F. Supp. 3d 1227, 1235 (W.D. Wash. 2018); *Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933, 938 (Wash. 1998) ("When an insurer fails to adequately investigate an insured's claim, the insured must either perform its own

24   investigation to determine if coverage should have been provided or take no action at all. In either situation, the insured does not receive the full benefit due under its insurance contract.").

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT - 14

1     2. <u>Materiality</u>

2    It is undisputed that Sagdai refused to provide requested records in derogation of his duty

3 to do so under the Policy, and that he refused to submit to an IME. *See* Dkt. No. 51 at 14, 16. The

4 parties' core dispute is whether the requested records and IME were material "to the investigation

5 or handling of a claim," and if so, whether Travelers was prejudiced by Sagdai's refusal to provide

6 them. *Staples*, 295 P.3d at 207; Dkt. No. 51 at 11–17. In addition, Sagdai argues that Travelers'

7 requests for an IME were never reasonable, alluding to the Policy language requiring the insured

8 to submit to physical exams "as often as [Travelers] *reasonably* requires." Dkt. No. 51 at 10–16

9 (emphasis added).

10    "In general, information is material when it concerns a subject relevant and germane to the

11 insurer's investigation as it was then proceeding at the time the inquiry was made." *Staples*, 295

12 P.3d at 207 (cleaned up). "If the insurer claims that it was deprived of the ability to investigate, it

13 must show that the kind of evidence that was lost would have been material to its defense." *Mut.*

14 *of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 878 (Wash. 2008).

15    Travelers avers that its review of the available medical records revealed "no subjective

16 evidence of any cognitive brain injury" and supported its $10,000 valuation of the claim. Dkt. No.

17 41 at 4–5. When Sagdai's counsel rejected the offer, Travelers stated that it was continuing to

18 review the claim "as a matter of good faith," requested an additional IME "to further evaluate

19 [Sagdai's] UIM claim," and requested Sagdai's consent to review the existing IME performed in

20 relation to his PIP claim, noting that the PIP IME was unavailable for Travelers' review without

21 such consent. Dkt. No. 19-1 at 2. Travelers asserts that it "cannot be logically rebutted" that

22 "[o]btaining an IME and medical records from an insured who is making a claim for injuries

23 constitutes a material request," and argues that Sagdai's refusal to satisfy these requests prevented

24 Travelers from evaluating his claim and "review[ing] the entirety of [his] preexisting medical

records"—records that, once produced in accordance with the Court's order, "directly contradicted [his] claims." Dkt. No. 55 at 5–7; *see also* Dkt. No. 41 at 19; Dkt. No. 44 at 4 (because the adjustor assigned to the UIM claim "could not properly evaluate whether there was in fact any type of a brain injury" without "having the benefit of an IME in regard to Sagdai's neurological conditions," he "believe[d] it was appropriate . . . to seek further information as to this alleged claim"); Dkt. No. 46 at 4 (an IME was necessary in this case due to "the discrepancy between his claim as to the extent of his injuries and the medical documentation available").

In response, Sagdai argues that, contrary to Travelers' assertions, it already had access to the PIP file and reviewed it before asking Sagdai to provide it. Dkt. No. 51 at 8. With respect to the IME, Sagdai contends it was unreasonable for Travelers to request a physical examination after it "completed its investigation," and an IME at that stage was therefore immaterial and not required under the Policy. Dkt. No. 51 at 10–16; *see also* Dkt. No. 18-2 at 28.

a.   *Materiality and Reasonableness of IME Request*

Sagdai advances two theories in support of his argument that the IME was immaterial: (1) an IME conducted too long after an accident "is <u>irrelevant</u> to the question of the earlier injury" and (2) even "if a medical examination was material, then Travelers had a duty to [conduct it] before it completed its investigation[.]" Dkt. No. 51 at 11 (emphasis in original). The latter theory precludes a finding of reasonableness in this phase of the litigation.

Sagdai first emphasizes that "the Rule 35 [e]xaminer chosen by Travelers, Dr. James Blue, has sworn under oath that an examination one and a half years after an accident is irrelevant to the question of the earlier injury." Dkt. No. 51 at 11. Dr. Blue explained that "it is the medical records alone that must give weight to the forensic opinions regarding injury and causation, not an examination one and a half years later." *Id.* at 12; Dkt. No. 53-1 at 4. However, Dr. Blue did not state that a later IME is always irrelevant, and his statement was addressing another case that does

not appear to have involved an allegedly ongoing traumatic brain injury, *see* Dkt. No. 53-1 at 2–5. While Dr. Blue's statement in this unrelated case could go to the weight of his testimony at trial, it does not demonstrate that an IME under the circumstances in this case was unreasonable or immaterial. *See, e.g.*, *Allstate Indem. Co. v. Lindquist*, No. 20-cv-1508-JLR, 2022 WL 2357007, at *7 (W.D. Wash. June 30, 2022) (explaining that defendant's "argument about the persuasiveness of [an expert's] testimony . . . is properly addressed to and resolved by the jury."). Indeed, here the parties dispute whether there was an ongoing brain injury at all, *compare* Dkt. No. 2-3 at 5 *and* Dkt. No. 44-2 at 2 *with* Dkt. No. 41 at 4–5 *and* Dkt. Nos. 44-1, 19-8, and even assuming an IME could not determine causation, it could determine whether Sagdai suffered from an ongoing brain injury. *See* Dkt. No. 18-1 at 18 ("Travelers is requesting an IME by a neurologist in order to . . . investigate [Sagdai's] current medical conditions"); Dkt. No. 41 at 8 (same); *Vario v. First Nat'l Ins. Co.*, No. C16-1900-RSM, 2017 WL 3172825, at *3 (W.D. Wash. July 26, 2017) ("[Plaintiff] claims his injuries, and the damages stemming from those injuries, are ongoing, thus making a medical examination relevant."). And this Court previously held that an IME was relevant in this case. Dkt. No. 28 at 4.

Sagdai relies on his claims handling expert, Robert Dietz, in advancing the alternative theory that an insurer is not entitled to request an IME after it completes its investigation of an insured's claim. Dkt. No. 51 at 13–16. Dietz testified in his deposition that his "criticism with respect to the examination rests solely with the timing of [Travelers'] request." *Id.* at 14; Dkt. No. 52-2 at 6; *see also id.* at 3 ("Well, if they think they need a physical examination, that should occur as part of their obligation to complete a reasonable investigation. And that's opposed to in this case, where they . . . supposedly [had] an internal review . . . and an evaluation based on that."). Dietz elaborated that it was incumbent on Travelers to first respond to Sagdai's request for information about the basis for its valuation of his claim "and then I think it was reasonable to

1    expect Sagdai to allow access to the PIP file and for scheduling a physical exam." Dkt. No. 52-2

2    at 9.

3           Dietz's opinions and Sagdai's arguments are self-contradictory. Dietz simultaneously

4    opines that a post-offer request is unreasonable but that it "was reasonable to expect Sagdai" to

5    comply after Travelers provided more information about its compromise offer. *Id.* at 5, 9. And

6    Sagdai emphasizes the Washington State Supreme Court's warning in *Staples* "that there must be

7    some limit" to an insurer's ability to demand examinations while also insisting that Travelers' sole

8    opportunity to conduct an exam was before it completed its investigation. Dkt. No. 51 at 13.

9    Sagdai's one-bite-at-the-apple approach would present insurers with a Hobson's choice[4]: demand

10   an IME from every claimant who might contest the claim valuation, thereby risking a bad faith

11   claim, or forego it and relinquish the right to request one even if it becomes relevant post-offer.

12   *See Staples*, 295 P.3d at 206 ("it would surely violate an insurer's good faith duty to demand an

13   [examination under oath] from every single claimant simply to burden insureds and set up pretexts

14   for denying claims.").

15          Although the Court finds that an IME was material to this case and rejects Sagdai's blanket

16   proposition that an "after the fact" request for an IME is per se unreasonable, the question remains

17   whether the *timing* of Travelers' IME request was unreasonable based on the specific facts of this

18   case. Sagdai argues that an adequate review of the records provided to Travelers would have

19   revealed that the severe impact of the motor vehicle accident caused Sagdai continuing cognitive

20   deficits. Dkt. No. 51 at 5–10. Therefore, at least according to Sagdai, Travelers should have

21   requested an IME as part of its initial investigation, rather than waiting until after the offer. *Id.* at

22

23   ───────────────

     [4] "[A]n apparent freedom to take or reject something offered when in actual fact no such freedom exists: an apparent
24   freedom of choice where there is no real alternative." *Tran v. State Farm Fire & Cas. Co.*, 961 P.2d 358, 366 (Wash.
     1998) (quoting Webster's Third New International Dictionary 1076 (3d ed. 1986)).

11, 13–14. These arguments, coupled with the apparent shortcomings of Travelers' initial investigation (discussed in detail below), are sufficient to preclude summary judgment. The Court cannot say that no reasonable trier of fact could find that Travelers' request was unreasonable. And Sagdai was not required to comply with unreasonable requests for an IME. Dkt. No. 18-2 at 28. Finally, although Travelers is correct that the Court has already held that an IME was relevant in its order granting Travelers' motion to compel, Dkt. No. 55 at 6 (citing Dkt. No. 28 at 4–5), that order did not address whether the *timing* of the request for an IME was reasonable for purposes of Travelers' lack of cooperation defense. Therefore, there is an issue of fact about the reasonableness of Travelers' post-compromise offer request for an IME.

### b.   *Materiality of PIP records*

The Policy requires Sagdai to "[a]uthorize [Travelers] to obtain: (a) medical reports; and (b) other pertinent records." Dkt. No. 18-2 at 28. Travelers avers that it requested access to the medical records in the PIP file, including an earlier IME located therein, Dkt. No. 19-1 at 2, because its practice is to assign different adjusters to an insured's PIP and UIM claims, and "the information between the two claims files is typically not shared" without the insured's permission. Dkt. No. 44 at 2. Mr. Dietz agrees that it is reasonable and a common industry practice to "split" the claims file this way. Dkt. No. 52-2 at 4-5; *see also* Dkt. No. 46 at 2.

It is undisputed that Sagdai refused to authorize Travelers to access the PIP file, but it is not clear that the file was material to Travelers' investigation. As Sagdai notes, William Shoemaker, a Claim Professional at Travelers, reviewed the material in the PIP file, and David Orme conducted a "management review." Dkt. No. 51 at 4, 17 (citing Dkt. No. 52-1 at 238 (November 5, 2018 note in Traveler's UIM file on Sagdai stating that "[i]n the meantime we can review what records we have in the PIP claim and form a general opinion of the injuries and set a logical reserve."); *id.* at 239 ("Reviewed medical records from PIP"; "no demand in yet – we have

only looked at the PIP records"); *id.* at 182–90 (Dr. Lecovin's IME)).[5] Mr. Shoemaker had a significant role with the UIM claim, reviewing the records and communicating with Sagdai's counsel in writing and by phone about Travelers' compromise offer. Dkt. No. 52-1 at 238; Dkt. No. 44-1 at 2. Therefore, there is an issue of fact about whether Travelers' employees evaluating the UIM claim accessed the PIP documents; if they did, then Sagdai's after-the-fact authorization may have been immaterial to Travelers' investigation.[6]

### 3. Substantial Compliance

Although Travelers' request for authorization to access the PIP file may not have been material to its investigation, it is undisputed that Sagdai refused to participate in an IME. However, there is a genuine dispute of material fact as to whether Travelers' request for an IME was reasonable. Because Sagdai would not have been required to submit to an IME if the request was unreasonable, the Court cannot conclude at this juncture that he failed to substantially comply with the terms of the cooperation clause.

### 4. Prejudice

The Court need not reach the issue of prejudice because a genuine dispute of material fact prevents Travelers from establishing the first two elements of its noncooperation defense. Because those elements have not been established, the Court denies Travelers' motion for summary judgment on Sagdai's breach of contract claim.

## E. Bad Faith Claim

---

[5] This Court's Standing Order for All Civil Cases prohibits citations in footnotes. Standing Order at 4, https://www.wawd.uscourts.gov/sites/wawd/files/KingStandingOrderReCivilCases.pdf. Sagdai's Response is replete with such citations. Dkt. No. 51. In the future, briefs that do not comply with the Standing Order will be stricken.

[6] In its reply, Travelers asserts that the claims handler for the UIM file did not access the PIP file "due to [Sagdai's] counsel's revocation of access to those materials." Dkt. No. 55 at 8. But materiality is still an unanswered question, as Travelers' UIM file on Sagdai contains pertinent notes from the PIP file. *See* Dkt. No. 52-1 at 239.

1    Sagdai argues that Travelers engaged in bad faith by (1) engaging a nurse reviewer to

2    evaluate the claim who mispresented facts and applied an incorrect presumption about his

3    preexisting conditions; (2) mispresenting pertinent facts to that reviewer; (3) falsely claiming that

4    it did not access the documents in his PIP file, (4) failing to provide a reasonable explanation for

5    its compromise offer, and (5) engaging in bad faith during this litigation. Dkt. No. 51 at 3–16.

6    Travelers counters that it conducted a reasonable investigation and paid Sagdai the full value of

7    his claim, and that in any event Sagdai has not shown that he incurred any damages as a result of

8    its alleged bad faith. Dkt. No. 41 at 1–2, 22–23. For the reasons set forth below, genuine disputes

9    of material fact preclude summary judgment on all but two of the bases for Sagdai's bad faith

10   claim.

11        1.    <u>Legal Standard</u>

12   "Claims of insurer bad faith are analyzed applying the same principles as any other tort:

13   duty, breach of that duty, and damages proximately caused by any breach of duty." *St. Paul Fire*

14   *& Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008) (cleaned up). An insurer has a

15   duty of good faith to its policyholder, and it typically owes a heightened duty to "give equal

16   consideration to the insured's interests and its own interests." *Liberty Int'l Underwriters v.*

17   *Carlson*, No. 04-cv-348-JLR, 2006 WL 623785, at *9 (W.D. Wash. Mar. 13, 2006) (citing *Am.*

18   *States Ins. Co. v. Symes of Silverdale, Inc.*, 78 P.3d 1266, 1270 (Wash. 2003)). However, this

19   enhanced duty does not exist with a UIM claim because the insurer stands in the shoes of the

20   tortfeasor, can assert any defense to liability that the tortfeasor has, and is therefore in an

21   adversarial relationship with its own insured. *See Garrison v. Allstate Ins. Co.*, No. 21-cv-00624-

22   DGE, 2022 WL 1061916, at *4 (W.D. Wash. Apr. 8, 2022). Nevertheless, the insurer still owes

23   the insured a duty of good faith and fair dealing. *Id.*

24   Washington courts have repeatedly emphasized that the test for bad faith "is not whether

the insurer's interpretation [of the policy] is correct, but whether the insurer's conduct was reasonable." *Wright v. Safeco Ins. Co.*, 109 P.3d 1, 10 (Wash. Ct. App. 2004); *see also Anderson v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1033 (Wash. Ct. App. 2000) ("The determinative question is reasonableness of the insurer's actions in light of all the facts and circumstances of the case."). Thus, "to succeed on a bad faith claim, the policyholder must show the insurer's breach of the insurance contract was unreasonable, frivolous, or unfounded." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003) (en banc). Whether the insurer acted reasonably is often a question of fact. *Id.*; *Hell Yeah Cycles v. Ohio Sec. Ins. Co.*, 16 F. Supp. 3d 1224, 1235 (E.D. Wash. 2014) ("Bad faith claims generally raise fact issues preventing a determination on summary judgment."). Accordingly, a bad faith claim "can be resolved on summary judgment only if there are no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances, or the insurance company is entitled to prevail as a matter of law on the facts construed most favorably to the nonmoving party." *Lindquist*, 2022 WL 2357007, at *5 (cleaned up). But this is not a free pass to trial, as the insured "has the burden of proof" and "must come forward with evidence that the insurer acted unreasonably." *Smith*, 78 P.3d at 1277.

### 2.   Failure to Cooperate

Travelers asserts that Sagdai's bad faith claim should be dismissed based on his failure to cooperate with Travelers' investigation. Dkt. No. 41 at 22; Dkt. No. 55 at 8–9. This argument is unavailing. Among other things, Sagdai accuses Travelers of bad faith in its initial investigation and compromise offer, Dkt. No. 1-2 at 12–15; Dkt. No. 51 at 3–10—actions that occurred before Sagdai refused to provide access to the PIP file or undergo an IME. Dkt. No. 44-1 at 2 (April 19, 2019 compromise offer); Dkt. No. 19-1 at 2 (August 22, 2019 letter requesting access to the PIP file and for an IME). For that reason, Travelers cannot show that it was prejudiced in its initial investigation or in making the compromise offer.

3.      Access to the PIP File

In his opposition to Travelers' motion, Sagdai contends that Travelers engaged in bad faith by repeatedly requesting access to the documents in his PIP file even though it had already reviewed the documents therein. Dkt. No. 51 at 3–4. But Sagdai does not include this basis for his bad faith claim in his complaint, *see* Dkt. No. 1-2, and it cannot be asserted at this stage of the litigation without running afoul of Federal Rule of Civil Procedure 8. *See Pickern v. Pier 1 (U.S.) Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (Rule 8's liberal notice pleading standard "requires that the allegations in the complaint give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (cleaned up). Therefore, Travelers is entitled to summary judgment on Sagdai's assertion that it engaged in bad faith by requesting access to the PIP file.

4.      Bad Faith Investigation

An insured may maintain an action for bad faith investigation regardless of whether the insurer's coverage decision was correct. *Coventry*, 961 P.2d at 937.

Sagdai alleges that Travelers conducted a bad faith investigation of his claim because it did not adequately review or examine his medical records, did not draw reasonable conclusions from those records, and did not provide a reasonable explanation for its compromise offer. Dkt. No. 1-2 at 12–16; Dkt. No. 51 at 2–3, 5–10, 14–16 (asserting that Travelers gave its nurse reviewer incomplete records; that the nurse then misrepresented the facts from the records she did have; and that Travelers gave the Rule 35 examiner incomplete medical records and misleading property value documents). He specifically contends that Travelers claims personnel internally noted "[h]eavy damage" from a "severe rear end impact" to Sagdai's vehicle but informed the nurse reviewer that the vehicle had sustained only "moderate" damage. Dkt. No. 51 at 5. The nurse reviewer noted that "[t]here was rear end and front end damage" to the vehicle without noting its extent. Dkt. No. 52-1 at 242.

1        Travelers counters that the nurse "made her own conclusions based on the information that

2   was provided," Dkt. No. 55 at 8, but that statement is not supported by any citation to the record.

3   Nor has the nurse reviewer submitted a declaration. Moreover, the record shows that the nurse

4   reviewer's evaluation was inaccurate. She wrote that there was no evidence "of a concussion

5   diagnosis (wider ranging injury to the brain)." Dkt. No. 52-1 at 243; *id.* at 244 ("at no point was a

6   concussion diagnosis made."). But before her review, Dr. Gorman diagnosed Sagdai with a

7   "[s]hake type closed head injury on 10/20/2013 with some cognitive slowing, headache, retrieval

8   type memory deficit and diminished smell sensation." Dkt. No. 52-1 at 226. Dr. Kelly saw Sagdai

9   in November 2016 and noted that Sagdai had suffered a "concussion with no loss of

10  consciousness" from the accident. *Id.* at 61. He also wrote that his diagnostic impression "indicates

11  manifestations of traumatic brain injury[.]" *Id.* at 62.

12       The nurse reviewer also indicated that Sagdai's injuries did not affect his ability to work:

13  "All the while claimant continued working as a general contractor." *Id.* at 243. But Dr. Gorman

14  stated that Sagdai was "unable to work" for three weeks shortly after the accident. *Id.* at 226. In

15  February 2014, Dr. Yetena Zrazhavskaya listed the symptoms Sagdai reported to her after the

16  accident, including "diminished memory" and "nausea, headache, shooting pain to his head,

17  thoracic and low back pain, brain fog, loss of concentration." *Id.* at 204 She observed that "[a]ll of

18  those symptoms started after [the motor vehicle accident] and they make it so difficult to run [his]

19  construction business and be productive." *Id.* (noting that Sagdai would tire at work so easily that

20  "he is not working on [the] construction site by himself."). While Travelers alleges that it lacked

21  medical records from Sagdai's PIP file, Dkt. No. 44 at 2–4, it does not allege that it lacked medical

22  records from Drs. Gorman, Kelly, and Zrazhavskaya. *See also* Dkt. No. 52-1 at 239 (pertinent

23  notes from PIP records in Travelers' UIM file for Sagdai); *id.* at 238, 239 (notes in the same portion

24  of the file to "review for relatedness of the concussion to ongoing complaints of a TBI"). There

are issues of fact regarding whether the nurse reviewer relied on inaccurate or incomplete information and inaccurately summarized the medical information for the claims adjuster. *See Dees v. Allstate*, 933 F. Supp. 2d 1299, 1308 (W.D. Wash. 2013) (denying summary judgment on bad faith claim where it was unclear whether the insurer "properly considered all medical evidence in the case.").

There is also an issue of fact regarding whether Travelers' explanation for its coverage decision was reasonable. Insurers in Washington are required to provide a reasonable explanation for a compromise offer, Wash. Admin. Code § 284-30-330(13), and a violation of the insurance code regulations constitutes a breach of the insurer's duty of good faith. *See, e.g.*, *Rizzuti v. Basin Travel Serv. of Othello, Inc.*, 105 P.3d 1012, 1019 (Wash. Ct. App. 2005). Travelers' explanation of its compromise offer contained at least two inaccuracies. It stated that Sagdai "did not miss any time" from work and was diagnosed with a "contusion type head injury." Dkt. No. 44-1 at 2. But as set forth above, Sagdai missed three weeks of work in accordance with his doctor's recommendation, Dkt. No. 52-1 at 226, and was diagnosed with a concussion, *id.* at 61. In addition, Mr. Dietz opines that based on his experience, the explanation was insufficient. Dkt. No. 52-2 at 14 ("[I]n my 32 years, it doesn't meet a reasonable explanation."). Finally, Travelers' conclusory and inaccurate explanation is of the type that courts have found to violate the insurance code. *See, e.g.*, *Travelers Cas. & Sur. Co. v. Spectrum Glass Co., Inc.*, No. 11-cv-1324-JCC, 2012 WL 3780356, at *5 (W.D. Wash. Aug. 31, 2012) (insurer's letter was insufficient where it "merely listed the . . . claims and relief sought, identified various policy provisions and two exclusions, and concluded summarily that the entire . . . action was not covered beyond $100,000 in defense expenses."); *Hell Yeah Cycles*, 16 F. Supp. 3d at 1234 (finding violation where insurer "provided little or inaccurate explanation" for the basis of its denial).

     5.    <u>Alleged Bad Faith After Filing of UIM Lawsuit</u>

Sagdai asserts that Travelers engaged in bad faith during this litigation, including by "rely[ing] on the memory of a documented brain injured person instead of the medical records from the time of the collision." Dkt. No. 51 at 18; *see also* Dkt. No. 1-2 at 14–15. He appears to be referring to the deposition Travelers conducted in this case, but he cites no authority to support this theory. Nor has he cited any way that Travelers has used his deposition testimony other than to cite it to the Court in its motion for summary judgment. And there is no evidence that he has experienced damages as a result of those citations. The Court has already held that Travelers was entitled to depose Sagdai in this litigation, Dkt. No. 28 at 1, and doing so was not bad faith.

Moreover, Sagdai did not include this basis for his bad faith claim in his complaint, Dkt. No. 1-2, and he has not cited anything in the record to support his allegations of litigation-based bad faith. Dkt. No. 51 at 18. Therefore, Travelers is entitled to summary judgment on Sagdai's assertion that it has engaged in bad faith during this litigation.

6.    Damages

Travelers also argues that Sagdai cannot show that he has incurred damages as a result of Travelers' alleged bad faith, and that the litigation-based damages he cites are insufficient. Dkt. No. 55 at 11. "In a first-party [insurance] context, there is no rebuttable presumption of harm." *Coleman v. Am. Com. Ins. Co.*, No. 09-5721RJB, 2010 WL 3720203, at *3 (W.D. Wash. Sept. 17, 2010) (citing *Coventry*, 961 P.2d at 938). "The insured must prove actual harm, and its damages are limited to the amounts it incurred as a result of the bad faith, as well as general tort damages." *Id.* The insured is "'liable for the consequential damages to the insured as a result of the insurer's breach of its contractual and statutory obligations.'" *Id.* (quoting *Coventry*, 961 P.2d at 939).

Sagdai does not just allege litigation-based damages; he alleges damages from the collision that exceed the $10,000 paid by Travelers and the loss of the use of that money. Dkt. No. 51 at 19; *see also* Dkt. 1-2 at 16. That allegation is sufficient at this point to create an issue of fact regarding

1    whether he suffered actual damages as a result of Travelers' alleged bad faith. *See, e.g.*, *Fireman's*

2    *Fund Ins. Cos. v. Alaskan Pride P'ship*, 106 F.3d 1465, 1470 (9th Cir. 1997) (damages for a bad

3    faith claim can "include loss of use of funds the [insured] would have received if the [i]nsurer

4    honored the claim"); *see also Dees*, 933 F. Supp. 2d at 1308 ("If [the plaintiff] can establish that

5    she incurred damages as result of the automobile accident and those damages are covered by her

6    UIM policy but remain unpaid in bad faith, then [she] is entitled to recover those damages.").

7        Accordingly, Travelers is not entitled to summary judgment on Sagdai's bad faith claim

8    except with respect to his theories based on Travelers' request for PIP files and litigation conduct.

9    **F.    CPA Claim**

10        To establish a CPA claim, a plaintiff must prove that (1) the defendant engaged in an unfair

11    or deceptive act or practice (2) occurring in trade or commerce and (3) impacting the public interest

12    that (4) injured the plaintiff's business or property and (5) was caused by the defendant. *Hangman*

13    *Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). A violation of an

14    insurance regulation satisfies the first three elements of a CPA claim. *Naxos, LLC v. Am. Fam. Ins.*

15    *Co.*, No. 18-cv-1287-JLR, 2020 WL 777260, at *22 (W.D. Wash. Feb. 18, 2020); *see also*

16    *Cochrane v. Am. Guar. & Liab. Ins. Co.*, 471 F. Supp. 3d 1140, 1154 (W.D. Wash. 2020) ("[A]n

17    insurer's 'bad faith constitutes a per se violation of the CPA.'" (quoting *Ledcor Indus. (USA), Inc.*

18    *v. Mut. of Enumclaw Ins. Co.*, 206 P.3d 1255, 1262 (Wash. 2009))).

19        Sagdai contends that Travelers "engaged in unfair or deceptive acts or practices when

20    investigating and processing [his] UIM claim." Dkt. No. 1-2 at 17. Travelers argues that it is

21    entitled to summary judgment on that claim because Sagdai cannot demonstrate that it engaged in

22    an unfair or deceptive act and cannot establish an actual injury to his business or property. Dkt.

23    No. 41 at 24. Sagdai did not respond to this portion of Travelers' motion, but the Court cannot

24    assume that the claim lacks merit based on a failure to respond on summary judgment. LCR

7(b)(2).

As set forth above, a jury must decide whether Travelers' investigation and explanation for its compromise offer were in bad faith and/or whether they violated Washington Administrative Code § 284-30-330(13). If the jury's verdict is adverse to Travelers on these issues, then the first three elements of Sagdai's CPA claim would be established. *Naxos, LLC*, 2020 WL 777260, at *22. And as to the fourth element, the "deprivation of contracted-for insurance benefits is an injury to business or property" under the CPA. *Peoples v. United Servs. Auto. Ass'n*, 452 P.3d 1218, 1222 (Wash. 2019). Recoverable damages under the CPA "can include policy benefits that were unreasonably denied, subject to the policy's limits and other applicable terms and conditions." *W. Beach Condo. v. Commonwealth Ins. Co. of Am.*, 455 P.3d 1193, 1200 (Wash. Ct. App. 2020) (holding that the trial court erred in not allowing the jury to decide whether the insurer violated the CPA "by failing to pay for . . . covered damage."). And because Sagdai alleges that Travelers underpaid the claim based on its faulty investigation and conclusions, the allegedly underpaid damages would be "causally linked" to those "unfair or deceptive act[s]." *Schreib v. Am. Family Mut. Ins. Co.*, 129 F. Supp. 3d 1129, 1137 (W.D. Wash. 2015) (cleaned up). Sagdai also alleges another source of injury under the CPA: he incurred damages hiring an expert "both for claims handling and for the investigation of his injuries." Dkt. No. 51 at 19. "An insured is injured for purposes of the CPA if, 'as a result of [an insurer's] bad faith investigation,' the insured 'hired insurance experts to determine if coverage was denied in bad faith.'" *Hopkins v. Integon Gen. Ins. Co.*, No. 21-35196, 2022 WL 851750, at *1 (9th Cir. Mar. 22, 2022) (quoting *Coventry*, 961 P.2d at 939).

Accordingly, it is for a jury—not the Court—to decide Sagdai's CPA claim.

### III.    CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Travelers'

1    motion for summary judgment. Dkt. No. 41. The Court GRANTS the motion as to Sagdai's claim

2    for bad faith based on Travelers' litigation conduct and request for access to the PIP file.

3    Otherwise, the motion is DENIED.

4            Dated this 3rd day of November, 2022.

5

6                                                   Lauren King
                                                    United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24